IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

JO ANN JACKSON,                      )     CASE NO. 1:15cv1203
                                     )
                 Plaintiff,          )
v.                                   )
                                     )     MAGISTRATE JUDGE
                                     )     KENNETH S. McHARGH
                                     )
COMMISSIONER OF SOCIAL               )
SECURITY ADMINISTRATION,             )     **OPINION & ORDER**
                                     )
                 Defendant.          )

This case is before the Magistrate Judge pursuant to Local Rule 72.2(b).  The issue before the undersigned is whether the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Jo Ann Jackson's ("Plaintiff" or "Jackson") applications for Supplemental Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq.*, and for a Period of Disability and Disability Insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, is supported by substantial evidence and, therefore, conclusive.

For the reasons set forth below, the Magistrate Judge AFFIRMS the decision of the Commissioner.

## I.  PROCEDURAL HISTORY

Plaintiff filed applications for Disability Insurance benefits and Supplemental Security Income benefits on February 19, 2013, alleging she became disabled on January 1, 2012. (Tr. 174-184).  The Social Security Administration denied Plaintiff's applications on initial review and upon reconsideration. (Tr. 131-32, 135-36, 143-44).

1

Jackson requested that an administrative law judge convene a hearing to evaluate her applications. (Tr. 147).  On January 14, 2015, a hearing was held before Administrative Law Judge Pamela E. Loesel ("ALJ"). (Tr. 28-68).  Plaintiff, represented by counsel, appeared and testified before the ALJ. (*Id*)  A vocational expert ("VE"), Mr. Gale Klier, also appeared and testified. (*Id.*).  On February 22, 2013, the ALJ issued a decision finding Plaintiff was not disabled. (Tr. 19-33).  After applying the five-step sequential analysis,[1] the ALJ determined Plaintiff retained the ability to perform work existing in significant numbers in the national economy. (*Id.*).  Subsequently, Plaintiff requested review of the ALJ's decision from the Appeals Council. (Tr. 16).  The Appeals Council denied his request for review, making the ALJ's February 22, 2013, determination the final decision of the Commissioner. (Tr. 1-3).  Plaintiff now seeks judicial review of the ALJ's final decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c).

---

[1] The Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a determination as to "disability."  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The Sixth Circuit has summarized the five steps as follows:

(1)    If a claimant is doing substantial gainful activity–i.e., working for profit–she is not disabled.

(2)    If a claimant is not doing substantial gainful activity, her impairment must be severe before she can be found to be disabled.

(3)    If a claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

(4)    If a claimant's impairment does not prevent her from doing her past relevant work, she is not disabled.

(5)    Even if a claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that accommodates her residual functional capacity and vocational factors (age, education, skills, etc.), she is not disabled.

*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990); *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

## II. EVIDENCE

### A.  Personal and Vocational Evidence

Plaintiff was born on April 24, 1966, and was 48-years-old on the date the ALJ rendered her decision. (Tr. 156).  Accordingly, Plaintiff was considered a "younger person" for Social Security purposes. *See* 20 C.F.R. §§ 404.1563(c), 416.963(c).  Plaintiff completed high school and formerly worked at a daycare center providing child care for pre-school age children.  (Tr. 82-83).

### B.  Medical Evidence[2]

#### 1.  Physical Impairments

The record shows Plaintiff was treated by Lolita Agra, M.D., from January of 2003 through June of 2012.  (Tr. 250-286).  During this time, Dr. Agra treated Plaintiff for various afflictions, including frequent sinus infections, carpal tunnel pain, bronchitis/COPD, lupus, anxiety, knee pain, and ongoing gynecological issues including pelvic and breast pain.  (*Id.*). Plaintiff complained of knee pain during multiple office visits, often following minor injury such as falling down stairs or banging her knee on a table, and prescribed Celebrex for knee pain in April of 2003.  (Tr. 266-68, 272-73).  Treatment notes showed Plaintiff fell and hurt her back and knee on September 24, 2003, and complained of low back pain in June and November of 2003, October of 2004, April of 2005, and again in March, April and August of 2006.  (Tr. 250, 264, 272-73, 275-76).  Plaintiff presented to Dr. Agra after hurting her back after again falling in August of 2007 and December of 2008, and after a car accident in May of 2012. (Tr. 251, 253, 281, 284).  Noting a history of back pain, Dr. Agra completed an Employee Health Verification

---

[2] The following recital of Plaintiff's medical record is an overview of the medical evidence pertinent to Plaintiff's appeal.  It is not intended to reflect all of the medical evidence of record.

3

Form on June 5, 2012, limiting Plaintiff to no heavy lifting following surgery on her left breast. (Tr. 286).

Plaintiff also sought treatment at the Emergency Room a few days after seeing Dr. Agra, on May 24, 2012, complaining of headache and back pain for two days.  (Tr. 385, 387).  Plaintiff was diagnosed with headache, UTI, and low back pain.  (Tr. 395, 398).  At that time Plaintiff described her car accident, occurring on May 8, 2012, indicating she had been a restrained driver, taking a front-end hit at 5 mph, with no airbag deployment.  (*Id.*).  Plaintiff stated she was not taking medication for pain, although prior prescriptions for Vicodin were on file.  (Tr. 387-88).  Examination revealed lumbar spine tenderness over L3, that Plaintiff could ambulate easily, and her pain improved with medication.  (Tr. 389-90). Lumbar X-ray imaging was within normal limits, with some moderate disc space narrowing at L5/S1.  (Tr. 389, 393).

On February 18, 2011, Plaintiff attended a follow-up appointment with Rheumatologist Rula Hajj-Ali, M.D., who diagnosed lupus, fibromyalgia, and fatigue.  (Tr. 308-11).  At that time Plaintiff complained of hand pain and feeling tired, and physical examination showed Plaintiff's gait was within normal limits without the use of assistive devices, and no synovitis in her joints, although joint pain was noted in her diagnosis.  (Tr. 309-11).  Dr. Hajj-Ali continued Plaintiff on Paxil, Vicodin, and amitriptyline for her Fibromyalgia, instructing her to begin aquatic therapy and consult a physical therapist.  (Tr. 311).

Plaintiff returned to Dr. Hajj-Ali's office on multiple occasions between July of 2011 and June of 2012 with continued complaints of fatigue, hand pain, and occasional flares of joint pain. (Tr. 327, 329, 361, 376-78, 399).  Physical examination consistently revealed gait within normal limits without the use of assistive devices, symmetrical strength proximally and distally, and no synovitis of the joints.  (Tr. 329, 363, 378, 400).  Notes showed Plaintiff's lupus was stable, that

4

her fibromyalgia was "active" (with no changes) due to increased pain from her gynecological issues, and that reassessment of that condition was necessary after her planned hysterectomy and breast surgery.  (*Id.*). Katherine Tuthill, RN, CNP, noted on February 28, 2012, that heavy periods, requiring a hysterectomy scheduled for March, may be contributing to her pain and fatigue. (Tr. 376).  Plaintiff continued to take Vicodin and Ibuprofen for pain, and Seroquel was added in June of 2012 to help with fibromyalgia-related sleep difficulties.  (Tr. 330, 361, 364, 376, 379, 401-02).

At a surgical consultation relating to Plaintiff's breast pain and fibroadenomas dated August 23, 2011, Pedro Escobar, M.D., noted on review of symptoms that Plaintiff was negative for back, muscle, and joint pain, as well as for joint swelling.  (Tr. 335-37).  However, during another gynecological consultation and exam dated September 28, 2011, Mehdi Moslemi Kebria, M.D., noted review of systems showed Plaintiff was positive for joint pain.  (Tr. 344).  After multiple reschedules due to Plaintiff suffering from colds, she underwent a hysteroscopic myomectomy, polypectomy, and D and C with Smith morcellator on September 11, 2012.  (Tr. 442).  At a follow-up with Colleen A Raymond, M.D., on September 18, 2012, Plaintiff complained of persistent abdominal pain, and reported bouts of chronic joint pain and lupus, requiring narcotics (Vicodin) for pain control.  (Tr. 442).  Dr. Raymond prescribed Vicodin, which was gone by Plaintiff's follow-up visit on September 24, 2012, but notes indicated Plaintiff was not taking Ibuprofen or requesting a refill of Vicodin, and that her overall pain was decreased.  (Tr. 443, 446).  However, on September 27, 2012, Plaintiff presented at the ER with cramping and low abdominal pain and chest pain, experienced since her gynecological surgery.  (Tr. 454).  Review of symptoms at that time revealed no muscle weakness or aches, and examination showed full range of motion in all four extremities with no focal deficit, and normal

gait.  (Tr. 455).  Eric Anderson, M.D., prescribed five Vicodin tablets and instructed Plaintiff to use over-the-counter naproxen for pain.  (Tr. 456).

On January 15, 2013, Plaintiff saw Yasmin Khan, M.D., a rheumatologist, with complaints of constant right knee pain.  (Tr. 535).  Treatment notes listed a past medical history of lupus, Sjoegren syndrome, fibromyalgia, Grave's disease, and hypertension, and Dr. Khan noted she complained of intermittent pain, swelling and stiffness consistent with fibromyalgia. (*Id.*).  Plaintiff indicated her knee pain was worse with weight bearing and walking, but relieved when straightening her legs and taking Percocet, and review of systems showed no gait problems, numbness, or burning pain.  (Tr. 535-36).  Examination showed some mild swelling and tenderness in her hands and wrist, with full range of motion, localized swelling and full range of motion in her right knee, and no swelling or tenderness, with full range of motion, in her ankles.  (Tr. 538).  Plaintiff further exhibited no CVA tenderness in her back, and Dr. Khan indicated her knee pain was unlikely related to lupus or other inflammatory arthropathies.  (Tr. 538-39).

Also on January 15, 2013, Plaintiff was further evaluated by Stanley Ballou, M.D., whose report reflected much of the same findings as those of Dr. Khan, and included that her knee pain is well-localized and relieved somewhat by rest and Percocet.  (Tr. 540).  Dr. Ballou noted Plaintiff was ambulating without difficulty, and suggested that the lack of objective evidence for inflammatory arthritis, along with Plaintiff's lack of response to prednisone, were indicative of an internal derangement causing her knee pain, such as a lateral meniscus tear or chondromalacia patella, and ordered an X-ray.  (*Id.*).

Plaintiff presented on January 22, 2013 at the office of Charlotte Wagamon, M.D., an orthopaedic specialist, complaining of right knee pain for two months, which was worse when

she was lying down, walking, or standing.  (Tr. 527).  Notes indicate a past medical history including lupus and fibromyalgia, current medications including prednisone, tapazole, Percocet, and flexeril, and noted that Plaintiff's rheumatologist did not think her knee pain was due to lupus.  (*Id.*).  Examination revealed her right knee had no ecchymosis, erythema, or swelling but was tender to palpation, had full range of motion and intact ligaments.  (*Id.*).  Dr. Wagamon did not prescribe pain medication upon request of Plaintiff, but prescribed a brace and physical therapy.  (*Id.*).

On January 28, 2013, Plaintiff attended an office visit with Mehrnaz Hojjati, M.D., who noted she was a patient of Dr. Hajj-Ali, last seen in July of 2012, but had discontinued care at their office when he refused to continue refilling her narcotic meds due to too frequent filling of the prescription.  (Tr. 476).  Additionally, notes indicated she was referred to a pain clinic but she did not attend.  (*Id.*).  Dr. Hojjati included narcotic dependency/abuse in her listed problems.  (*Id.*).  At that visit, Plaintiff complained of pain in her hands, in her right knee, and occasionally in her ankles and hips, and reported that her pain was not responsive to steroids and that Motrin, Tramadol, ice and heat were not helpful.  (*Id.*).  On examination, Dr. Hojjati found no synovitis and full range of motion in all joints, with tenderness to palpitation over her wrists, ankles, and right knee, and mild/moderate lupus with chronic pain.  (Tr. 478, 480).  Dr. Hojjati did not prescribe narcotics for pain, but referred Plaintiff to a pain clinic and physical therapy.  (Tr. 480).

Plaintiff was examined by Brendan Astley, M.D., on March 20, 2013, on referral for low back pain and knee pain for 10 years, with her knee described as hurting only about 6-7 months.  (Tr. 509).  Plaintiff reported to Dr. Astley that her pain is constant, sharp, burning, dull and that nothing relieved her pain, including pain medication, a TENS unit, physical therapy, and chiropractic treatment.  (*Id.*).  Plaintiff indicated she did not often participate in physical therapy,

and that her knee pain kept her awake at night.  (*Id.*).  Dr. Astley conducted a pain assessment and found Plaintiff was positive for depression and weakness, that her duration for standing or walking was 10 minutes, and less than one hour for sitting, with a reported pain level of 8 out of 10.  (*Id.*).  Examination showed lumbar flexion was not painful, with extension moderately painful, and paravertebral exam showed tenderness to palpation bilaterally.  (Tr. 512).  Plaintiff exhibited normal sensation and strength in her upper and lower extremities, except active movement against resistance in her right lower extremity, and lateral pain in her right knee. (*Id.*).  Knee X-ray showed no abnormality, and Dr. Astley increased Tramadol, prescribed a small prescription for Percocet for nighttime pain, and directed Plaintiff to participate in pool therapy and continue with physical therapy, and scheduled an MNBB L3-5 bilaterally.  (*Id.*).  Dr. Astley further noted a lumbar X-ray showed arthritis in the L4-S1 area, and that her recent labs for lupus were normal, but to follow-up with her arthritis doctor.  (*Id.*).

Todd M. Markowski, CNP, attended to Plaintiff on March 28, 2013, for complaints of gradually worsening right knee and lumbar back pain, which she described as sharp, excruciating and continuous, made worse by lying on her side.  (Tr. 500).  N.P. Markowski noted on examination Plaintiff showed her lumbar spine, right hip, and right knee were tender to palpation, that Plaintiff was wearing her knee brace, and that she exhibited full muscle strength in her upper and lower extremities.  (Tr. 501).  Plaintiff stated she had not started taking Ultram because her insurance would not cover it, and N.P. Markowski re-wrote the prescription for Ultram (Tramadol) for a lesser amount, and provided her with Percocet.  (Tr. 504).

On referral from Dr. Hojjati for a chronic pain consultation, Plaintiff saw Shrif Costandi, M.D., on April 5, 2013, presenting with a chief complaint of right leg pain for 6 months.  (Tr. 699).  Plaintiff indicated she is in constant pain that is aching and dull, ranging between 7 and 10

8

on the pain rating scale.  (*Id.*).  She reported she can sleep for 7 hours uninterrupted, denies that the pain is worse at night, but stated her symptoms interfere with physical activity and the pain is exacerbated by standing and walking.  (*Id.*).  Treatment notes further show a history of pain medications, but that Plaintiff did not participate in physical therapy or home exercise.  (*Id.*). Physical examination showed normal musculoskeletal findings, including full range of motion without reproducible pain, and no pain on palpation of the lumbar spine, normal extremities, but with some tenderness in her right sacroiliac joint and lateral knee.  (Tr. 702).  Dr. Constandi further noted her recent X-ray showed no acute findings, but moderate disc space narrowing at L5/S1, and acknowledged Plaintiff's history of opioid abuse/dependence.  (*Id.*).  Physical therapy, steroid injections, and potentially radiofrequency ablation were expressed as beneficial treatment options, with Dr. Constandi rejecting long-term opioid therapy.  (Tr. 703).

State Agency consultant Teresita Cruz, M.D., reviewed Plaintiff's record on April 17, 2013, and determined her medical problems were adequately controlled with treatment.  Dr. Cruz opined Plaintiff was capable of light exertional activity, with occasional climbing, stooping, kneeling and crouching due to her complaints of back and knee pain.  (Tr. 80).  Further, Dr. Cruz determined Plaintiff should avoid extreme temperatures and humidity, as well as concentrated levels of respiratory irritants due to her asthma.  (*Id.*).  On reconsideration, Plaintiff's record was reviewed by State Agency consultant Jeffrey Vasiloff, M.D., who affirmed the opinion of Dr. Cruz, but opined Plaintiff:  could never climb ladders, ropes, or scaffolds; could frequently finger and handle; and should avoid all exposure to workplace hazards.  (Tr. 111

On April 23, 2013, Plaintiff underwent a medical branch block at the right L3, L4 and L5 levels to address her "significant history of low back pain."  (Tr. 657).  Dr. Astley noted the procedure was well-tolerated, and that Plaintiff had "excellent resolution of symptoms."  (*Id.*).

At a gynecological follow-up for pelvic pain and fibroids on July 2, 2013, Plaintiff stated she was tired of being in pain, and that while she was taking tramadol for her back pain, it was not effective for her pelvic pain.  (Tr. 717-18).  Maureen Suster, M.D., prescribed a small amount of Percocet at that time, and directed her to get any refills from Dr. Astley.  (Tr. 718).  On that same day, Plaintiff was seen by Bernadette Bogdas, CNP, with complaints of pain due to her lupus, stating that everything hurts and that nothing helped.  (Tr. 722).  Nurse Bogdas informed her she had missed multiple appointments with specialists, which Plaintiff then rescheduled and requested a refill on Motrin, as she stated Ultram was no longer working.  (*Id.*). On examination Nurse Bogdas observed that Plaintiff was ambulatory but that she walked cautiously (reportedly due to pain), and that she was tearful when discussing her pain.  (Tr. 723).

At a follow-up with Dr. Astley on July 18, 2013, Plaintiff reported unchanged lumbar pain described as sharp, intense, intermittent, and chronic, made worse by flexion and rotation. (Tr. 709).  Plaintiff reported some relief following the medial branch block, but then the pain returned, and she requested having the procedure performed again. (*Id.*).  Notes indicated she was responding appropriately to opioid therapy, and Dr. Astley observed tenderness to palpation over the paraspinal muscles.  (Tr. 712).  X-ray showed well-maintained disc space, and intact lumbar vertebrae without fracture or dislocation, and another medial branch block was performed for congenital spondylolisthesis on September 13, 2013.  (Tr. 715, 730).  Notes stated the procedure went well and Plaintiff had excellent resolution of symptoms.  (Tr. 730).  Further, Plaintiff indicated she wanted more pain medication, but notes showed she would not be written any more prescriptions for opioids after revealing she obtained medications "off the street." (*Id.*).

At a follow-up with Nurse Bogdas on September 30, 2013, Plaintiff stated she had no relief of her pain symptoms and requested analgesics.  (Tr. 742-43).  Complaining that CCH does not care about her pain, she stated she will not go back, that she will not see pain management again, and that she will just "suffer" with the pain.  (Tr. 743).  Notes indicated Plaintiff had not shown up for multiple appointments over the past several months.  (*Id.*).  Examination showed she was ambulatory and tearful when discussing her pain.  (Tr. 745).  On October 14, 2013, Plaintiff reported to Eileen Coppola, CNP, that she had a gradually worsening course of pain, and her pain log following her last MNBB showed no relief.  (*Id.*).  Plaintiff described her pain as intense, continuous, throbbing and aching, made worse by movement.  (*Id.*).  Examination showed normal gait, full strength in her back, and no clonus, but tenderness to palpations over Plaintiff's right SIJ.  (Tr. 779).  Plaintiff told N.P. Coppola her pain is excruciating, and that she is unable to lie on her right side because the pain radiates down her right leg into her foot and toes.  (*Id.*).  N.P. Coppola gave Plaintiff a Tramadol cocktail for one month until her pain management program was determined, and she reinforced the importance of back protection and maintaining a regular program of improving strength and flexibility.  (Tr. 782).

Plaintiff returned to Dr. Hojjati for a follow-up on November 19, 2013, with a problem list of lupus, chronic lower back pain (noted as followed with the pain center), and knee pain.  (Tr. 831).  Treatment notes indicated Plaintiff complained of pain in her right hip when she lays on it, pain in her right thigh and knee, worse at night,that swelling in her hands and feet had not been bad recently, and that it seemed the swelling in her hands and wrists had resolved.  (*Id.*).  Records further showed that she had no synovitis, her prednisone was decreased, that Plaintiff would soon be receiving an injection from Dr. Samuel for her back pain, and that her last hip X-ray was "fine."  (Tr. 831-32).

During a pre-operation visit on March 4, 2014, prior to a hysterectomy, Plaintiff reported a history of severe pelvic pain, and review of symptoms noted she had moderate asthma, lupus and Sjogren's syndrome, major depression, and Grave's disease under treatment.  (Tr. 979).  Plaintiff further indicated at that time she was sober from alcohol and cocaine since 2004.  (Tr. 980).  Surgery was performed on June 5, 2014, and post-operation records showed Plaintiff reported adequate pain control and that she was ambulating without difficulty. (Tr. 1011-13, 1016).  Plaintiff was discharged in an improved condition with no tenderness or edema of the extremities, and she was instructed not to engage in heavy lifting for six to eight weeks.  (Tr. 1016-17, 1026).  At a follow-up on June 20, 2014, Plaintiff complained of continued pain in her lower right abdomen and hip, straining with urination, and concerns with her incision, which was noted as well-healed.  (Tr. 1038).  Notes showed Plaintiff would not wait for examination by the doctor, that the doctor would not prescribe more Percocet, and Plaintiff was referred to pain management with a prescription for Motrin.  (*Id.*).  Plaintiff called the office later that day and stated the pain kept her up at night, and notes indicated the office reinforced the importance of not continuing her on Percocet.  (*Id.*).

Plaintiff returned to Dr. Astley in July and August of 2014, complaining or worsening back pain as well as post-operation pain.  (Tr. 1054, 1081).  Dr. Astley remarked that Plaintiff was responding appropriately to opioid therapy for her pain, and examination showed tenderness on palpation over her paraspinal muscles.  (Tr. 1057-58, 1084).  In July of 2014 he increased her Tramadol, and prescribed Flexeril and Percocet, noting she would not likely continue on Percocet.  (Tr. 1058).  On August 20, 2014, Plaintiff told Dr. Astley she is in pain all the time and unable to lay comfortably, and X-rays showed a fairly normal exam.  (Tr. 1081).  Noting she was told the rules of the clinic prior to the visit and that no opioids would be prescribed because

12

she tested positive for hydrocodone, Dr. Astley recorded that Plaintiff stated she received Vicodin from her dentist because she was getting all her teeth pulled.  (Tr. 1081, 1084).

Plaintiff returned to pain management on August 7, 2014, at which time she was told the Percocet prescription she was receiving was the last narcotics prescription she would get.  (Tr. 1074).  Notes indicate that Plaintiff kept telling N.P. Coppola throughout the entire exam that she needed to get her medications refilled, and that Dr. Astley refills all her medications.  (*Id.*).

### 2.  Mental Impairments

At the request of the Social Security Administration, Plaintiff was examined by psychologist David V. House, Ph.D., on May 10, 2013.  (Tr. 687-92).  During her examination, Plaintiff told Dr. House that she has one friend, does not get along with her only living sibling, that she is not active with church or in the community, and that two of her six children live with her.  (Tr. 688).  Examination notes show Plaintiff last used crack cocaine and quit drinking in 2012, and reported to Dr. House that she also quit smoking.  (*Id.*).  She reported her medical diagnoses as lupus, asthma, hypertension, and GERD, denied ever going to a psychiatric hospital, stated she went to MetroHealth for either counseling or case management services, and was prescribed Seroquel, Paxil, and Amitriptyline.  (Tr. 689).  Dr. House observed Plaintiff's presentation reflected some pressure and slightly elevated anxiety, and documented Plaintiff's report that she can be impulsive, gets angry and throws things, and has terrible energy levels and motivation.  (*Id.*).  Plaintiff stated she had been depressed for over five years, had suicidal thoughts, had mood swings and crying episodes on a daily basis, experienced asthma-related panic attacks, and stated she did not go out because she has trouble getting around, although Dr. House observed she did not have trouble ambulating.  (Tr. 689-90).  Dr. House further observed that Plaintiff did not appear to be in pain at the examination.  (Tr. 690).

13

Based on his examination, Dr. House diagnosed chronic conditions of Mood Disorder NOS, Post-traumatic Stress Disorder, and Polysubstance Abuse in reported remission. (Tr. 691). As to her work-related functioning, Dr. House opined that Plaintiff's long and short term memories were intact and that she should be able to follow instructions, and that she has some disruption in terms of concentration and attention, but not significant so as to cause concern. (Tr. 691-92). He further stated Plaintiff was able to follow relatively simple, multi-step directions, is a bit socially isolated but due more so from physical health issues, and that there were no accounts of major difficulties getting along with others, specifically coworkers or supervisors. (Tr. 692). Dr. House opined that, despite depression and some anxiety, Plaintiff retained some emotional resources and coping skills for responding appropriately to work pressures, assigned her a GAF of 50, based on moderate impairments of employability and recent thoughts of death, but gave her a "fair" prognosis in recognition that she receives some treatment. (Tr. 692).

State Agency consultant Cynthia Waggoner, Psy.D., reviewed the record on June 4, 2013, and opined that Plaintiff had mild limitations in her activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 77, 81-82). Dr. Waggoner found that Plaintiff would be capable of performing simple and some multi-step tasks, as well as adapting to occasional or minor changes in work setting. (Tr. 81-82). Another consultant, Tonnie Hoyle, Psy.D., affirmed the findings of Dr. Waggoner on August 9, 2013. (Tr. 107, 112-13).

On October 1, 2013, Plaintiff underwent a mental health assessment on referral by her primary care physician for depression, conducted by Gabriela Feier, M.D., a psychiatrist. (Tr. 760). Present illness history identified a history of depression and an "extensive" history of substance use, but reported sobriety from cocaine and alcohol for 19 years. (Tr. 761-62).

14

Plaintiff complained of weight loss, low appetite, sleeplessness, no energy or motivation, and anger and irritability.  (Tr. 761-62).  During her evaluation, Plaintiff explained she wants to be left alone and does not like the people she lives with (her boyfriend, children, and grandchild), that she has had recent suicidal thoughts and ideas to hurt others, but that she has no plan to act on them, that she gets upset when she does not get her way and is "unable to keep her emotions under control," and that she has anxiety about her children, experiencing minor panic attacks on occasion.  (Tr. 762).  Plaintiff further mentioned she has chronic pain from lupus, and that she has financial difficulties and is applying for disability.  (*Id.*).  Assessment notes showed Plaintiff previously took medication for depression, but that she did not take them long enough, and that she last held a job as a cashier ten years prior.  (Tr. 762, 765).  A physical pain assessment showed Plaintiff reported pain rated at 8 out of 10 in her hands, feet, and knees, and at that time she had an appointment scheduled for pain management at UH.  (Tr. 764).

Mental status examination showed Plaintiff was adequately groomed and oriented to time, person, and place, but that she exhibited restless, impulsive, and agitated behavior.  (Tr. 765).  She displayed rapid speech and a disorganized thought process, with tangential associations, questionable judgment and insight, an emotional and labile affect, and an irritable, angry, and frustrated mood.  (*Id.*).  Further, while her recent and remote memory appeared adequate, Plaintiff was distractible in the area of attention span and concentration.  (*Id.*).  The assessment indicated the following diagnostic impression:  Mood disorder NOS, r/o MDD, r/o mood disorder due to GMC (lupus), and cocaine and alcohol dependence in full sustained remission, and prescribed Seroquel.  (Tr. 766).

Plaintiff returned to Dr. Feier on October 18, 2013 for pharmacologic management.  (Tr. 807).  At the appointment Plaintiff reported slightly better mood, improved sleep, and that she

was better able to tolerate her living situation (which was better) and life frustrations, noting she found Seroquel beneficial and requested an increased dose.  (Tr. 809).  Plaintiff told Dr. Feier she was still very seriously depressed, but that she maintained her sobriety.  (*Id.*).  On examination, Plaintiff was cooperative and calm (noted as a big improvement from the previous visit), exhibited spontaneous speech with a normal rate and flow, logical and organized thought process, memory within normal limits, fair judgment and insight, and sustained attention and concentration.  (*Id.*).  Her mood was determined as depressed, anxious, and irritable, and Dr. Feier's impression was that Plaintiff was coping better and improving despite still having depressive symptoms and anger. (*Id.*).  Plaintiff also reported a pain level of 7 out of 10 in her legs.  (*Id.*).  At a follow-up appointment on December 3, 2013, Dr. Feier observed similar findings but noted Plaintiff presented with a euthymic mood and did not report any pain that day, and Plaintiff reported being calmer and better able to tolerate stress.  (Tr. 949-50).

However, on July 8, 2014, Plaintiff reported financial difficulties and unhappiness with her boyfriend, and stated that her anger and patience was getting really bad. (Tr. 1047).  Plaintiff stated she had poor sleep due to frequent need to use the bathroom, and that she was depressed about her health, specifically her lupus (referred to as her "generalized blood cancer") and pain in her hands, feet, and joints.  (*Id.*).  Notes showed Plaintiff took Seroquel once per day, although she was prescribed to take it twice, and that she isolates herself.  (*Id.*).  On examination, Dr. Feier observed poor hygiene, and that Plaintiff exhibited a depressed mood and labile affect, but that she was cooperative, had sustained attention and concentration, had fair judgment and insight, and that her memory was within normal limits.  (*Id.*).  Notes further stated that she did not report any pain that day, and that Plaintiff reported "significant new stressors."  (*Id.*).

16

At the October 18, 2013 appointment, Plaintiff requested from Dr. Feier that she fill out disability paperwork.  (Tr. 809).  In her check-box assessment, Dr. Feier opined Plaintiff could rarely perform any of the work-related tasks under each domain, except that she could occasionally: follow work rules; respond appropriately to changes in routine settings; function independently without redirection; understand, remember, and carry out simple job instructions.  (Tr. 820-21).  Further, Dr. Feier determined Plaintiff could frequently manage her own funds and schedules, as well as leave home on her own.  (Tr. 821).  In support of her conclusions, Dr. Feier pointed to Plaintiff's diagnosed Mood Disorder NOS, specifying her depressive symptoms, frustration, rage, irritability, and that she is unable to keep her emotions under control.  (*Id.*).

Hearing Testimony

Plaintiff testified that she lives with her two adult teenage sons, and her boyfriend on and off to help her.  (Tr. 38).  She stated she handles very little of the chores, but that she washes dishes, vacuums, cooks, and grocery shops sometimes, and gets help with other chores.  (Tr. 38-39).  Although she used to drive, Plaintiff testified she stopped driving two years prior because she had "no transportation," and that she now gets rides from her godfather or uses public transportation if she needs to go somewhere.  (Tr. 39).  Plaintiff stated she watches television, reads, and listens to music, will do chores on an average day with the help of her sons but "basically supervise[s]," and walks her dog during the summer. (Tr. 40-41).  She further stated she has no family or friends she sees on a regular basis, and used to go to church every Sunday but had not been for the past eight months.  (*Id.*).  Plaintiff affirmed she was self-employed from 2004 to 2011, working at a small daycare center, with job duties generally described as sitting and watching pre-school aged children, but that she also prepared meals and occasionally pick up a child.  (Tr. 42-44).  Plaintiff testified she quit that job because of pain, that her most significant

problem currently is back pain, and that she takes medication that she finds ineffective, and does not do physical therapy at home because it made the pain worse.  (Tr. 44-46).  She also stated she could not do prescribed aqua therapy, and that she wore braces on her knees every other day. (Tr. 48-49).  Plaintiff testified she is in counseling for mental health issues, and that Seroquel is helping with those issues, but that she is still depressed.  (Tr. 53-54).

### III. SUMMARY OF THE ALJ'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2. The claimant has not engaged in substantial gainful activity since January 1, 2012, the alleged onset date.

3. The claimant has the following severe impairment:  systemic lupus erythematosus, Sjogren's Syndrome, degenerative disc disease (lumbar), osteoarthritis (knees), fibromyalgia, asthma, affective disorder (mood disorder, not otherwise specified (NOS)), anxiety disorder (posttraumatic stress disorder (PTSD)), and substance addiction disorder (polysubstance abuse in reported remission).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except:  She is able to occasionally lift and carry twenty pounds and frequently lift and carry ten pounds.  She is able to stand and walk six hours of an eight hour workday.  She is able to sit for six hours of an eight-hour workday.  She is unlimited in her ability to push and pull other than shown for the lift and/or carry limitations.  She can occasionally climb ramps and stairs.  She should never climb ladders, ropes and scaffolds.  She can frequently balance.  She can occasionally stoop, kneel, crouch and crawl.  She should avoid concentrated exposure to extreme cold and extreme heat.  She should avoid concentrated exposure to humidity, fumes, odors, dusts, gases and poor ventilation.  She is limited in handling and fingering to frequent in the bilateral upper extremities.   She should avoid all exposure to hazards meaning unprotected heights and hazardous machinery.  She can perform simple and some multi-step tasks (consistent with unskilled and semi-skilled work) with occasional changes in the work setting.

6. The claimant is capable of performing past relevant work as a child daycare center worker. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.

7. The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2012, through the date of this decision.

(Tr. 12-22) (internal citations omitted).

## IV. DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance and/or Supplemental Security Income benefits only when she establishes disability within the meaning of the Social Security Act. *See* 42 U.S.C. §§ 423, 1381. A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months." *See* 20 C.F.R. §§ 404.1505, 416.905.

## V.  STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards. *See Cunningham v. Apfel*, 12 F. App'x. 361, 362 (6th Cir. 2001); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.* The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this Court would resolve the issues of fact in

19

dispute differently or substantial evidence also supports the opposite conclusion.  *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  This Court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner*, 745 F.2d at 387.  However, it may examine all the evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## IV. ANALYSIS

### A. Treating Physician Analysis

Plaintiff argues that the ALJ violated the treating physician rule in her analysis of Plaintiff's medical records, specifically as applied to the opinions of Dr. Hajjati and Dr. Feier.  In determining Plaintiff's RFC, the ALJ gave "little weight" to these opinions. (Tr. 20).  The parties do not dispute that Dr. Hajjati and Dr. Feier were both treating physicians.

It is well-established that an ALJ must give special attention to the findings of the claimant's treating sources. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). This doctrine, often referred to as the "treating source rule," is a reflection of the Social Security Administration's awareness that physicians who have a long-standing treating relationship with an individual are best equipped to provide a complete picture of the individual's health and treatment history. *Id.*; 20 C.F.R. §§ 416.927(c)(2), 404.1527(c)(2).  The rule establishes that opinions from treating physicians are entitled to controlling weight if the opinion is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with the other substantial evidence in the case record." *Wilson*, 378 F.3d at 544. When a treating source's opinion is not entitled to controlling weight, the ALJ must determine

20

how much weight to assign to the opinion by applying factors set forth in the governing regulations. 20 C.F.R. §§ 416.927(c)(1)-(6), 404.1527(c)(1)-(6).  The regulations also require the ALJ to provide "good reasons" for the weight ultimately assigned to the treating source's opinions that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinions and the reasons for that weight. *See Wilson*, 378 F.3d at 544 (*quoting* S.S.R. 96-2p, 1996 WL 374188, at *5).

The undersigned finds the ALJ's decision adequately articulated the reasonable basis for her weighing of the medical opinions, and demonstrated that she properly considered the evidence of record in accordance with the treating source rule. The Sixth Circuit "has consistently stated that [the Commissioner] is not bound by the treating source's opinions, and that such opinions receive great weight only if they are supported by sufficient clinical findings and are consistent with the evidence." *Combs v. Comm'r of Soc. Sec*., 459 F.3d 640, 652 (6th Cir. 2006) (en banc) (*citing Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993)). Further, for her decision to stand, an ALJ need not point to every piece of evidence in the record. *See, e.g., Thacker v. Comm'r of Soc. Sec*., 99 F. App'x 661, 665 (6th Cir. 2004).  Here, prior to weighing Dr. Hajjati's opinion, the ALJ sufficiently summarized his examination findings and treatment history with Plaintiff, including his opinion as described in the Medical Source Statement.  (Tr. 18, 20).  She further summarized the overall treatment record, including examination and procedure notes from other treatment providers, as well as objective imaging and testing results. (Tr. 13-21).  The ALJ then makes clear that she found Dr. Hojjati's opinion was not consistent with examination and radiology results, and not supported by the preponderance of evidence in the record, which supported lesser limitations.  (Tr. 18, 20).  As such, she was not required to give the opinion controlling weight under the treating source rule. *See Wilson*, 378 F.3d at 544.

Finding his opinion was not entitled to controlling weight, the ALJ was next tasked with determining the appropriate weight to assign the opinion of Dr. Hojjati. The Sixth Circuit has established:

> When the treating physician's opinion is not controlling, the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors.

Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 242 (6th Cir. 2007) (citing Wilson, 378 F.3d at 544). A factor-by-factor analysis is not required so long as the ALJ's decision clearly conveys why the opinion was credited or rejected. See Francis v. Comm'r of Soc. Sec., 414 F. App'x 802, 804 (6th Cir. 2011); see 20 C.F.R. §§ 416.927, 404.1527 (when reviewing a claimant's treating source opinions, the ALJ is required to "consider" the factors set forth when making his decision). Thus, a treating source analysis does not fail merely because an ALJ does not expressly address each of the factors in her opinion to show she considered them. Rogers, 486 F.3d at 242.

The ALJ specifically identified that she found Dr. Hojjati's opinion was entitled to little weight, and her opinion demonstrated that she considered the requisite factors and provided good reasons for her conclusion. She reviewed the treatment history with Dr. Hojjati and considered his opinion along with Plaintiff's ongoing treatment records from a multitude of sources, which consistently showed reports of fluctuating pain levels treated with pain medication and injections, as well as referrals to physical therapy, along with generally normal or mild to moderate radiology and examination findings. (Tr. 13-14, 16-21, 17, 20, 27, 329, 363, 390, 393, 400, 657, 699, 712, 730, 824, 843, 848, 850, 905). The ALJ clearly acknowledged Plaintiff's diagnoses, including her fibromyalgia, and ongoing reports of pain, stiffness, and tenderness, but

also determined the evidence showed she is not limited from all activities, and that "she is able to move about and she can use her arms, hands and legs in a satisfactory manner." (*Id.*). The ALJ also pointed out Dr. Agra's directive to avoid heavy lifting (finding this consistent with Plaintiff's ability to perform light work), and reports that Plaintiff missed treatment appointments (including with pain management), and did not consistently follow through on prescribed treatments, including physical therapy and medications. (Tr. 17-19, 20, 27, 286, 722, 840, 921). Further, the ALJ considered Plaintiff's testimony regarding her impairments and their impact on her ability to work, as well as evidence as to Plaintiff's daily activities, including the performance of household chores, taking care of pets, and her ability to get around outside of the home. (Tr. 15-17, 211). Although Plaintiff cites to some evidence in her brief that could arguably support a finding of greater limitations, she fails to point to any contradictory evidence in the record that was not considered by the ALJ in rendering her decision, and the ALJ appropriately weighed the evidence to draw her own conclusions. *See Simpson v. Comm'r of Soc. Sec.*, 344 Fed. App'x 181, 194 (6th Cir. 2009) ("The ALJ is not bound to accept the opinion or theory of any medical expert, but may weigh the evidence and draw his own inferences."). Given this analysis, the ALJ appropriately assigned little weight to the opinion of Dr. Hojjati, explaining the record supported only minimal limitations requiring an RFC for light work.

The ALJ also appropriately considered and weighed the opinion of Dr. Feier, Plaintiff's treating psychiatrist, finding her opinion that Plaintiff's mental conditions caused highly restrictive limitations inconsistent with the moderate findings supported by the record. (Tr. 20-21). Prior to determining the weight to give to the opinion of Dr. Feier, the ALJ clearly recognized the treatment relationship, beginning on October 1, 2013, and summarized each assessment and pharmacological appointment Plaintiff attended with Dr. Feier, citing notes from

all but one appointment.  (Tr. 19).  The ALJ also summarized the opinion of state agency examining consultant Dr. House, who reported the same diagnoses as Dr. Feier, but found her symptoms were not as limiting as those expressed in Dr. Feier's opinion.  (Tr. 15-17). Despite Plaintiff's assertion that the ALJ failed to address certain limitations in Dr. Feier's opinion, the ALJ recited the specific limitations found by Dr. Feier in her Medical Source Statement, completed on October 18, 2013, and found the opinion was not entirely supported by the record. (Tr. 19-20).  Assigning little weight to her opinion, the ALJ stated that documentation in the record supported a finding of only moderate limitations in concentration, persistence or pace. (Tr. 20).  After further discussing the opinions of the non-examining state agency consultants, the ALJ explained that the record, including Plaintiff's own reports of her daily activities and social interactions, demonstrated that, despite her mental health conditions, she is able to think clearly and act in her own best interest, retained some emotional resources and coping skills, and is capable of performing simple and some multi-step tasks.  (Tr. 15-17, 21).

Although the undersigned acknowledges that the ALJ's explanation in the paragraph addressing her decision to assign "little weight" to the opinion of Dr. Feier provides minimal elaboration, any error is harmless, as a reading of the decision in its entirety clearly demonstrates that the ALJ considered the requisite factors, and pointed to substantial evidence in the record that supported her conclusion.  Failure to strictly follow the treating source rule may be harmless "where the Commissioner has met the goal of 1527(d)(2)—the provisions of the procedural safeguard of reasons—even though she has not complied with the terms of the regulations." *Friend v. Comm'r of Soc. Sec.*, 375 Fed. App'x 543, 550 (6th Cir. 2010) (*quoting Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004)).  This requirement may be met "when the 'supportability of a doctor's opinion, or its consistency with other evidence in the record, is

*indirectly* attacked via an ALJ's analysis…of the claimant's ailments." *Id.*  (*citing Nelson v. Comm'r of Soc. Sec., 195 F. App'x 462, 470-72* (6th Cir. 2006) and *Hall v. Comm'r of Soc. Sec., 148 F. App'x 456, 464 (6th Cir. 2006)*).

Here, the ALJ's decision made evident her consideration of the required factors and allows for identification of the ALJ's reasons for affording the opinion of Dr. Feier less weight. *See Karger v. Comm'r of Soc. Sec., 414 Fed. App'x 739, 753* (6th Cir. 2011) ("Notably, courts look to the ALJ's decision itself, and not other evidence in the record, for support."). Acknowledging the treating relationship, the ALJ summarized Plaintiff's initial assessment with Dr. Feier, noting it was a few weeks before she completed the Mental Capacity Medical Source Statement, as well as her subsequent pharmacological management appointments. (Tr. 19-20). Her decision showed treatment notes from these appointments documented that Plaintiff had moderate symptoms that improved with medication, although she continued to complain of depression and anxiety, and the ALJ further identified that Plaintiff had not shown up for five appointments.  (Tr. 19, 809, 949-50).  Although the ALJ does not specifically mention one pharmacological appointment on July 8, 2014 where Plaintiff complained of worsening anger and patience and admitted she was not taking her medication as prescribed, treatment notes from this date show findings similar to those from previous appointments with Dr. Feier, and do not include any contradictory evidence that would lead the ALJ to reconsider her overall findings. (Tr. 1047); *see, e.g., Thacker, 99 F. App'x at 665* ("The ALJ need not discuss every piece of evidence in the record for his decision to stand.").  Her decision is further supported by the ALJ's consideration of Plaintiff's activities of daily living in relation to her mental health limitations, as well as her consideration of the opinions of state agency psychological

consultants, who acknowledged Plaintiff's mental health issues, but found her symptoms caused only mild to moderate limitations.  (Tr. 15, 19-20, 687-693).

The ALJ's decision to assign great weight to the opinions of the state agency consultants was supported by substantial evidence, and not in error, as asserted by Plaintiff. An ALJ is required to consider all of the medical opinion evidence, including the findings of state agency medical and psychological consultants.  *McGrew v. Comm'r of Soc. Sec.*, 343 Fed. App'x 26, 32 (6th Cir. 2009) (*citing* 20 C.F.R. 404.1527(f)(2)(i); *citing, see also, Hash v. Comm'r of Soc. Sec.,* *309 F. App'x 981, 989* (6th Cir. 2009)). The regulations recognize that opinions from non-examining state agency consultants may be entitled to significant weight, because these individuals are "highly qualified" and are "experts in Social Security disability evaluation."  20 C.F.R. 404.1527(e)(2)(i), 416.927(e)(2)(i).  Further, the ALJ appropriately considered the state agency consultants' opinions along with the entire record, including examination notes from treatment subsequent to their reviews, and Plaintiff fails to point to any evidence that undermines the ALJ's discretionary conclusions.  *See McGrew*, 343 Fed. App'x at 32 (finding an ALJ may rely on state agency physicians' opinions not based on the entire record where the ALJ considered medical examinations that occurred after those opinions were rendered, and accounted for any change in condition); *see generally Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) ("The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts.  If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.")

### B.  Pain Assessment

The Sixth Circuit follows a two-step process in the evaluation of a claimant's subjective complaints of disabling pain.  20 C.F.R. §§ 404.1529, 416.929; *Felisky*, 35 F.3d at 1039-40.

First, the ALJ must determine whether the claimant has an underlying medically determinable impairment which could reasonably be expected to produce the claimant's symptoms. *Rogers, 486 F.3d at 247*.  Second, if such an impairment exists, then the ALJ must evaluate the intensity, persistence and limiting effects of the symptoms on the claimant's ability to work. *Id.*  The ALJ should consider the following factors in evaluating the claimant's symptoms:  the claimant's daily activities; the location, duration, frequency and intensity of the claimant's symptoms; any precipitating or aggravating factors; the type, dosage, effectiveness and side effects of any medication taken to alleviate the symptoms; treatment, other than medication, the claimant receives to relieve the pain; measures used by the claimant to relieve the symptoms; and statements from the claimant and the claimant's treating and examining physicians. *Id.*; *see Felisky, 35 F.3d at 1039-40*; *S.S.R. 96-7p, 1996 WL 374186 (July 2, 1996)*.  The Sixth Circuit has established complaints of pain should not automatically be dismissed solely on a lack of objective evidence of severe pain.  *Felisky, 35 F.3d at 1039-40*.

An ALJ must give particular attention to these factors in cases involving pain due to fibromyalgia, which often produces little to no objective evidence of pain.  The Sixth Circuit has recognized that oftentimes fibromyalgia, unlike other medical conditions, "present no objectively alarming signs," and "patients 'manifest normal muscle strength and neurological reactions and have full range of motion.'" *Rogers, 486 F.3d at 243-44*.  As such, an ALJ should recognize that diagnosis of fibromyalgia is not determined by objective testing, and rather involves "(1) the testing of a series of focal points for tenderness and (2) the ruling out of other possible conditions through objective medical and clinical trials." *Id.* (*citing Preston v. Sec'y of Health & Human Servs., 854 F.2d 815, 820 (6th Cir. 1988)* (pur curium); *Swain v. Comm'r of Soc. Sec., 297 F. Supp. 2d 986, 990 (N.D. Ohio 2003)*).

The Court does not find merit to Plaintiff's argument that the ALJ improperly excluded from consideration Plaintiff's ongoing pain in formulating her RFC.  Although she found Plaintiff's statements regarding her impairments and their impact on her ability to work as a whole were "not entirely credible" due to a lack of support by the objective evidence, her opinion establishes that this was only one factor considered along with a range of evidence relating to Plaintiff's reports of pain.

In finding that Plaintiff did not have pain so substantial as to render her disabled, the ALJ acknowledged Plaintiff's diagnosis of fibromyalgia under the proper medical standards, and its accompanying chronic pain and stiffness, yet determined the evidence demonstrated satisfactory movement, and that she was not precluded from all activities.  (Tr. 13, 21).  Immediately prior to her conclusion that Plaintiff's allegations were not entirely credible, the ALJ considered Plaintiff's testimony as to her daily activities, which included washing dishes, vacuuming, cooking, and going to the grocery store, as well as utilizing public transportation.  (Tr. 16-17).  Further, after finding the objective evidence did not support Plaintiff's statements as to the severity of her symptoms, the ALJ conveyed her analysis of the medical evidence, considering objective testing and imaging, as well as treatment notes, medication and therapy, Plaintiff's response to treatment, and fluctuating reports of pain by Plaintiff and upon examination.  (Tr. 17-21).  The ALJ's analysis also appropriately considered medical source opinions, as described above, and noted a number of missed appointments with doctors, physical therapy, and pain management, before finally concluding her allegations of disability and an inability to work were only "partially credible."  (*Id.*).  Accordingly, ALJ drew reasonable conclusions from the overall record and did not rely solely upon a lack of objective evidence, nor did she entirely exclude pain from consideration. *Cf. Rogers, 486 F.3d at 248* (finding ALJ's assessment of subjective

complaints of pain related to fibromyalgia insufficient where he failed to discuss the standard for fibromyalgia and relied "on purely objective evidence, [and] failed to discuss or consider the lengthy and frequent course of medical treatment or the nature and extent of that treatment, the numerous medications [claimant] had been prescribed, [and] the reasons for which they were prescribed.").

## VII. DECISION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is not supported by substantial evidence.    Accordingly, the undersigned AFFIRMS the decision of the Commissioner.

s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge

Date:  September 30, 2016.

29